## A. H. BELO & CO. V. T. L. WREN.

### IN SUPREME COURT, TYLER TERM, 1884.

*Libel—Jurisdiction.*—The sale and distribution of copies of a newspaper containing libelous matter constitutes publication at common law, and circulation under our penal code. A civil action for damages will lie in any county where such sale or distribution occurs.

*Privilege.*—The proceedings of a legislative committee, empowered by law to collect and perpetuate evidence of a criminative character, which are merely preliminary, and conducted *ex parte* and in secret, are not privileged.

*Damages—Actual and Vindictive.*—Objection that the court did not direct the jury to separate the actual from the vindictive damages cannot be taken for the first time in this court.

Appeal from Travis county.

Two important points demand our consideration in determining the present appeal. 1. Did the district court of Travis county have jurisdiction of the cause ? 2. Was the alleged libelous matter of a privileged character ?

1. The defendants below all resided in Galveston county. The Galveston Daily News, in which the alleged libel appeared, was is-

sued from the press in that county and to subscribers living there. It had subscribers in the county of Travis to whom it was regularly mailed and delivered; and it was also sold to news agents in that county. The number in which the alleged libel appeared was mailed from the Galveston office of publication to its subscribers and The News agents in Travis county, and was read by such subscribers and by persons who bought it from The News agents.

It is claimed by the appellants that being residents of Galveston county, and because the paper was issued from the press at Galveston, has its office there, and is mailed there to subscribers in other counties, that county alone has jurisdiction of the cause.

The general rule is that every person against whom an action is brought must be sued in the county of his residence. Among other exceptions is the following : "Where the foundation of the suit is some crime or offense or trespass, for which a civil action in damages may lie, in which case the suit may be brought in the county where such crime or offense or trespass was committed, or in the county where the defendant has his domicile." (Rev. Stats., art. 1190, exception 8.)

By our criminal code, libel is declared an offense punishable by fine or imprisonment. (Crim. Code, Art. 617.)

It may be committed by either making, writing, printing, publishing, selling or circulating the malicious statement with' intent to injure another. By reference to articles 619, 620, and 621, it will be seen that these distinct methods, by which the offense may be committed, are pointed out. It will not be necessary for us to compare these definitions with those which are given by the common law. It is sufficient to say that within the meaning of publishing and circulating a libel are atleast contained all acts going to make up the offense of publishing a liable known to the law of England and our sister states. No doubt can arise upon the proof or pleading in this case but that the appellant sold and distributed the copy of their paper which contained the alleged malicious statement. Such sale and distribution constituted publication at common law ; it constitutes circulation under our penal code. As under the former, publication of libel was an offense indictable wherever it occurred, so under our law, circulation of a libel is an offense committed in any place where the libel is sold and distributed. [1 Bish. Cr. Proc., secs. 53, 57, 51 ; Com. vs. Blanding, 3 Pick, 304;

Rex vs. Girdwood, Leach, 142 ; Rex vs. Burdett, 4 Barn. & Ald. 85; Penal Code, arts. 616, 621.]

The fact that the crime of libel may have been completed by the publication of the paper in Galveston county, does not make it any less a crime to circulate the number containing the alleged libelous article in other places. By the common law the sale of each copy is a distinct publication (Odgers on Libel, 532), and hence a distinct offense, and the prosecutor may at least choose for which of the distinct offenses he will call the guilty party to account. A copy of the paper may be first sold to A, then one to B. and another to C ; but because the publication is completed by selling to A, the government is not bound to select that particular fact as the one upon which he will rely to prove the completion of the offense. It may indict for either of the sales, and as it makes no difference which was first in point of time, so for the same reason it is unimportant in what place the publication first took place. These principles are so well grounded in the law of libel that they would not have been noticed at such length but for the zeal and earnestness with which distinguished counsel have urged upon the court a contrary doctrine. Under our penal code each act of either making, publishing or circulating a libel, being a separate offense, we must hold that the circulation of THE NEWS containing the libelous statement in Travis county was such an offense, no matter what may have been done with reference to it in the county of Galveston. The offense having been committed in Travis county, and being indictable there, the present civil action for damages was properly brought in that county.

2. The question as to whether or not the alleged libelous publication was privileged matter, depends upon the particular facts proved upon the trial below. To these facts alone our decision is confined, as we do not propose to fetter our judgment so that it may not be fully exercised in any future case presenting a different state of circumstances.

We first briefly consider the law which, in our opinion, governs the case. If the publication was privileged at all, it was a conditional or qualified, and not an absolute privilege. The publication of defamatory matter is exempt from responsibility in such cases, because the demands of public policy for the publication outweigh all considerations requiring the protection of private reputation in

the particular case. The public are not regarded as having such an interest in proceedings embodying defamatory matter as will out-weigh the necessity for protecting the character of individuals unless they are proceedings of a legislative or judicial character. [Cooley's Con. Lim., 568 ; Townsend on libel, 411 ; Sanford vs. Bennett, 24 N. Y., 20.] This rule includes within itself proceedings of a quasi judicial character, i. e., before a body having the power to hear and determine matters submitted to its jurisdiction by the voluntary consent of its members. [Cooley on Const. Lim., 448 and note.] It is only an account of this judicial character that its proceedings are protected, and to give it such a character it must have authority not only to hear, but to decide the matters coming before it or to redress grievances of which it takes cognizance. [Barrons vs. Bell, 8 Gray, 301.]

But to be privileged the proceeding must have been not only judicial or legislative, but it must not have been preliminary, ex parte and secretly conducted. [Flood on Libel, 244 ; Townsend on Libel, sec. 231 ; McCabe vs. Caldwell, 14 Abb. Prac. Rep. 377; McBee vs. Fulton, 47 Md., 403.]

There may be cases where a preliminary or ex parte proceeding would be privileged, but as to this we do not decide ; but when to these two conditions is added the fact that the proceeding is conducted in secret, we know of no privelege in the law of libel that will protect the publication. Ex parte proceedings have been held privileged where there was a right in the accused to appear and defend himself. If privileged, where this was not the case, it was on the ground that they were open and might be attended by the public, and that their publication was, therefore, only an enlargement of the area to which a knowledge of the proceedings would otherwise extend.

But if merely preliminary and at the same time ex parte and secret, no policy of the law can be subserved by their publication which is not overborne by the damage which may result to the reputation of individuals. The accused may escape by reason of having publicity given to the preliminary proceedings upon which his prosecution is to be based. A person may have his case prejudged, and himself so far found guilty in public opinion as to deprive him of a future fair and impartial trial without any opportunity of defending himself in the preliminary proceedings ; or he may have his charac-

ter traduced without the slightest intimation that it will be the sub-ject of investigation or discussion. It is true that the same thing may happen in a public trial, but what occurs there is open to the world ; and what the public are entitled to witness, may in many instances be disclosed to it through other channels. Even this, how-ever, is not a universal rule, as there are cases where the defamatory matter may be spoken in privileged places when its publication at other places would constitute libel. (Cooly on Const. Lim. 457 et. seq. ; Townsend on Libel, sec. 219 and notes.) This is always the case where the proceeding in which it is uttered is of a secret character. (Flood on Libel, 193, 194.)

We think that the privilege of publishing defamatory matter is confined strictly to proceedings of a judicial or quasi judicial or legislative nature, and if preliminary and ex parte, they must at least be openly conducted and subject to the inspection of the pub-lic. This is as far as it is necessary for us to go in this case now in consideration, to which case let us apply the principles above announced.

The joint committee appointed by the legislature of Texas, before whom the defamatory words published by the appellant were spoken, was not a body possessing judicial or quasi judicial powers. It de-termined nothing ; exercised its judgment upon no question re-quiring judicial action ; did not even procure evidence which could be recognized in a court of justice for any purpose whatever. It simply obtained the statements of witnesses under oath, to be used, not in a court of justice, but as a guide to attorneys representing the state in bringing offenders against her criminal laws to justice. Nor can its proceedings, in strictness, be termed legislative. The committee was appointed by the legislature, and was composed of members of that body ; but it was to do nothing in aid of legislation —it was not even to report anything for legislative action. The duties required of it, and the powers granted it, could as well have been discharged and exercised by persons not connected in any manner with the legislature. The result of its labors was never one necessarily to come to the knowledge of that body, nor to form part of its records in any manner whatever. They are an irregular and irresponsible committee, exercising doubtful powers, and formed for no other purpose connected with the duties of the body from which they derived their appointment. It would seem, therefore, rather

a stretch of the meaning of the term "legislative" to apply it to proceedings of such committee.

But, admitting that they are legislative or judicial, or both, what was the object of the proceedings and how were they conducted ? Their object was to obtain evidence by which the state's counsel might be guided in instituting criminal prosecutions against the perpetrators of land frauds and forgeries. The proceeding of the committee did not rise to the dignity of those of a grand jury or of a justice of the peace making a preliminary examination.

These are filed in courts, and upon them a capias may issue and the offender be arrested and thrown into prison ; upon the action of this committee no such criminal process could be founded, and a seizure of any person under a writ issued as one of the results of their proceedings would only have laid the basis for an action of false imprisonment. So far from even becoming part of the records of a court, the purposes of the committee's formation were fully satisfied if the evidence procured by them was placed by them in the hands of any attorney employed by the state to prosecute land frauds and forgeries. Its proceedings, therefore, have not the slightest imaginable claim to being called even a preliminary examination in the legal sense of that term. Moreover, these proceedings were in their very nature essentially ex parte—so designed to be by the resolution creating the committee, and such were the practical constructions given to them by the committee itself. No party whose connection with land frauds was inquired into was ever allowed to appear before it and produce witnesses in rebuttal of the evidence adduced against himself. The inquisition was established for the purpose of prosecution only ; any defense the accused might have was reserved for the trial of the cause, when he was brought before the courts to answer the prosecution based pon the committee's evidence.

Again, the proceedings were secret—carrie . on with closed doors and in the presence only of the committee, t eir clerk and persons interested solely in the prosecution of the fr .uds developed by the evidence. There may, have been occasionally two witnesses in the room at one time, but this was an exceptional case, and did not deprive the proceedings of their general secret character.

It was obviously necessary that the proceeding should be kept secret, otherwise offenders having notice of the evidence given

against them would place themselves beyond the reach of the law. It was proper, too, in order to prevent innocent persons, against whom perjured witnesses might bring accusations, from suffering in reputation and in the good opinion of the public.

The fact that the evidence taken before the committee might be filed in the attorney general's office does not affect the question. The joint resolution would have been satisfied if this evidence had been committed to the state's private counsel alone. This shows that it was not intended to be made an archive of a public office, but, taken in connection with the purposes for which the committee was appointed, clearly shows that its contents were to rest within the knowledge of the state's chosen prosecuting officers, to be withheld by them from the public until the parties implicated in land frauds by the evidence should be placed within the grasp of the criminal law. The attorney general is the state's counsel, made so by law. Confidential communications between him and his client, and papers committed to his inspection, in reference to prosecutions like the present, must not be divulged before the prosecution has been commenced or abandoned. Otherwise the whole object of the proceeding would be thwarted. We do not think that it was his duty—not even his privilege—to give copies of the evidence to persons requesting them of him. This might end in giving information to the accused such as it was never intended he should receive in advance of his arrest or indictment. If the contents of the evidence could not be made known to a few through copies taken from the attorney-general's office, it certainly could not be published to the world through the newspapers. The plastic nature of the common law does not allow us, in deference to the improvements of modern times, and the advance of newspaper enterprise, to so vary the cardinal principles of the law of libel, that proceedings required by the policy of the law to be kept absolutely secret may be published to the world in the columns of a newspaper. We can not defeat the ends of justice and the objects of the criminal law for the purpose merely of satisfying the public craving for news and information.

Every facility should be allowed for the quick dissemination of useful facts, and the freedom of the press should not be restrained further than is absolutely necessary to protect private character from falsehood and slander. But the public policy alone protects defam-

atory statements made through the press, and they can not be shielded when made in defiance of one of the plainest principles of law established solely for the public benefit. We therefore conclude that the defamatory matter complained of by the appellee and proven to have been published by the appellants, was not of a privileged nature.

We are cited to some authorities supposed to hold a contrary doctrine to what we have above decided. We do not so understand them. The case of McBee v. Fulton, 47 Md., 403, was not a case of a preliminary ex parte proceeding, and the dicision is not authority for such a case. Besides, the decision itself is not only consistent with our views as to secret proceedings, but apparently recognizes that in such cases the rule as to privilege does not apply.

In Ferry v. Fellows, 21 La., Ann. 375, it is not made to appear that the proceedings were ex parte or that they were conducted in secret, and it is a fair inference that the action of the committee was intended to be reported to congress as a basis of legislative action on their part. The case is not clearly in point.

The case of Kane v. Mulvany, 2 Ir. R. C. L. 402, seems to have grown out of the publication of matters occurring before a committee of the House of Lords. We are not informed as to how those proceedings were conducted, whether ex parte or secret, or otherwise, but we are told that the decision was placed upon the ground that the committee had judicial powers, which destroys its applicability to the present case. We see nothing in this case not in accord with our present decision. If they did so hold, we should not hesitate still to adhere to the doctrine announced by us, as they are in harmony with the present weight of American and English authority, and supported by the view of the most eminent of text writers upon the subject of libel.

But admitting that the defamatory matter was privileged, did the appellants make a fair, just and full report of all that occurred during the committee's investigation which would have affected the belief of the public as to the guilt or innocence of the appellee, of the charges made against him by Stancel? It appears that much of the testimony was not reduced to writing, and hence, not published. Still it was part of the proceedings before the committee. It is hardly an excuse for the appellants that they could not obtain this testimony, if it contained facts favorable to Wren, and if it did not,

they should have shown it, or stated that it could not be procured in connection with the publication of other facts.

The letter of the attorney-general, accompanying the evidence of Stancel, forbade the publication of any statement made by a witness known to be guilty himself, implicating another believed to be innocent. The publication of this letter along with Stancel's evidence as to Wren, was equivalent to a declaration of the appellants, either that Stancel was not known to be guilty, or that Wren was not believed to be innocent, either of which, if believed, gave to the defamatory matter an appearance of truth.

It also appears from the letter of Senator Duncan that he preferred that the statements of Ham and others casting reflections upon Mr. Fisher and other persons interested in the prosecution should not be published. This was a mere suggestion, and not an absolute denial of the right to report such statements. It was nothing more than proper, under the circumstances, that the appellants should have shown that the false statements concerning these persons were not made by Stancel, if such were the truth. No one can tell from reading Stancel's evidence whether or not the defamed were Fisher and other prosecutors. If so, The News should have so stated and thus weakened the force of his testimony as to Wren. Whilst we do not hold that the permission of the attorney general, or of a member of the committee, justified the publication, yet, if offered as such justification, it must not appear that the letter granting the permission has been used so as to add force to defamatory matter contained in the evidence. It may be added that the joint resolutions having required that an abstract of the land titles effected by the forgeries should be filed in the land office, it was nothing more than just that the appellants should have made it known to the public, that the titles which Stancel had sworn were forged by Wren, did not appear from abstract to have been tainted with any fraud committed by him.

There are other questions raised in the record, but they are of minor importance, and some of them do not appear to be presented by proper assignments of error. The objections that the court did not direct the jury to separate the actual from the vindicative damages can not be taken for the first time in this court. The court should have been asked to submit a charge directing the jury to separate the one of these classes of damages from the other. (Inter-

national and Great Northern Railroad vs. Smith, decided at present term.)

The amount of damages in a libel suit is left largely to the discretion of the jury. They may take into consideration the motives of the publisher, and if the libel has been sold to the public indiscriminately the heavier damages are given, and evidence as to the mode and extent of the publication is at all times admissible. (Townsend on Libel, sec. 203 ; Odgers on Libel, p 208.)

When the actionable words are spoken within the scope of a private jurisdiction, the declaration may allege a consequential loss of customers at a place beyond the limits of such jurisdiction. (1 Starkie on Slander, pp., 442, 443.) All allegations as to damage to appellee outside of Travis county are but matters in aggravation of the general damages he was entitled to recover, without proof of any loss sustained by reason of the slanderous publication. The refusal of the court to sign the bill of exceptions, taken to the exclusion of Stewart's testimony, is not ground for a reversal of the judgment, because, had the appellants received the full benefit of the exception, it would not have availed them, the court having correctly excluded the testimony. The pleadings of appellee do allege that the evidence was taken by the committee in secret session, and hence the third proposition of appellants under the tenth assignment of error can not be sustained.

The other points presented by the record are not deemed of sufficient importance to require our attention.

There is no error in the judgment and it is affirmed.

Willie, C. J.